STEVEN G. KALAR
Federal Public Defender
Northern District of California
ANGELA CHUANG
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone: (415) 436-7700
Facsimile: (415) 436-7706
Email: Angela_Chuang@fd.org

Counsel for Defendant Dixson

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RONNY DIXSON,<br><br>Defendant. | **Case No.:** CR 19–527 WHO<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Court:** Courtroom 2, 17th Floor<br>**Hearing Date:** February 20, 2020<br>**Hearing Time:** 1:30 p.m. |

# INTRODUCTION

Ronny Dixson has spent the last thirty-plus years of his life battling an overwhelming addiction to cocaine base that took everything away from him—his job, his housing, his family, and all too often, his freedom. Before his substance abuse became unmanageable, he had lived a law-abiding life and had supported himself by working as a bike messenger and as a machinist. That all disappeared once the addiction took over, leading to homelessness, which in turn further exacerbated his drug use. It is largely because of his addiction that he began to cycle in and out of the criminal justice system. With no real opportunity for the intensive treatment and supportive services that he desperately needed to address his underlying substance abuse, he has been trapped in this cycle for over three decades, the vast majority of his adult life.

With no income to speak of, Mr. Dixson often supported his habit by agreeing to hold drugs for other people who were dealing, with the understanding that he would then receive drugs in return for his personal use. Such were the circumstances surrounding his commission of the instant offense, which was—much like most of his criminal history—ultimately driven by a longstanding drug problem that had taken over his entire life. Nonetheless, Mr. Dixson understands that he must face consequences for what he has done, and he takes full responsibility for his actions. He is asking the Court to take into consideration his extensive history of substance abuse, and how it has impaired his judgment as well as his ability to lead a productive life, when fashioning an appropriate sentence. Significantly, he is also asking the Court for help to address the foundational cause of his criminal behavior by considering his strong desire for treatment and the opportunity for such treatment that federal supervision, as opposed to further incarceration, would provide. He respectfully requests that the Court grant him a downward variance and sentence him to time served—the equivalent of four months in custody—and three years of supervised release.[1]

---

[1] The Probation Officer similarly recommends a downward variance, albeit a smaller one, to 12 months and 1 day. *See* Pre-sentence Report Sentencing Recommendation at 1. Mr. Dixson contends for the reasons set forth *infra* that a greater variance is warranted in his case.

**ARGUMENT**

**I.   A Sentence Of Time Served And Three Years Of Supervised Release Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of § 3553(a)**

In sentencing Mr. Dixson, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant; and (6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also directs the Court to consider a number of additional factors, including: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

The parties are in agreement with the Guidelines calculation in the Pre-Sentence Report ("PSR"). With a final offense level of 13 and a Criminal History Category of III, the resulting advisory Guidelines range is 18–24 months.

**A.   The nature and circumstances of the offense**

Mr. Dixson's arrest on the instant charges occurred during the government's Federal Initiative for the Tenderloin ("FIT"), which prioritizes federal prosecutions for cases arising in the Tenderloin, many of which would normally have been prosecuted in state court. Indeed, this matter represents Mr. Dixson's first federal case; all of his prior contacts, including numerous drug offenses, were state-level prosecutions. Here, Mr. Dixson was apprehended as part of an undercover buy/bust operation, during which an undercover San Francisco Police Department officer bought heroin from

Mr. Dixson's former co-defendant.[2] PSR ¶¶ 7–10. Mr. Dixson's role in the offense was merely to hold the "stash" for his former co-defendant who was the actual dealer. *Id.* ¶¶ 10, 101. Significantly, he held the drugs not for any personal financial benefit, but rather with the expectation that he would then receive food or drugs for his own personal use.[3] *Id.* ¶ 101.

Mr. Dixson acknowledges that his actions were wrong and criminal, but at its core, his conduct was a product of others taking advantage of particularly vulnerable populations—homeless people and drug addicts, both of which accurately describe Mr. Dixson's life circumstances—in order to shift potential criminal liability away from themselves. *See id.* ¶ 7 ("[I]t was common in this area for narcotics dealers to utilize homeless persons or those addicted to narcotics to store narcotics for them."). Because the offense level for drug offenses generally is based upon drug quantity, in what can only be described as a fluke, persons such as Mr. Dixson who hold drugs for dealers often face a higher Guidelines range than the dealers themselves. This produces a counterintuitive result where those who common sense dictates should be less culpable—the "stash" holders—end up with higher ranges than those who exploit them—the dealers. The Court can and should adjust for this discrepancy by varying downwards.

### B.     The history and characteristics of Mr. Dixson

Mr. Dixson's life has been anything but easy for the last 35 years; to the contrary, the majority of his adult life has been characterized by a serious drug problem that has never adequately been addressed, homelessness and poverty that further destabilized him, and estrangement from his family. While growing up in the Richmond District in San Francisco, Mr. Dixson was exposed to his stepfather's severe alcoholism that continued for years, eventually leading to his stepfather's death from alcohol-related health issues. *Id.* ¶¶ 96–97. Fortunately, his stepfather was not a mean or abusive drunk, but Mr. Dixson recalls numerous times when his stepfather would pass out in his car and Mr. Dixson would have to help him get back into the house. *Id.* ¶ 96.

Research has shown that exposure to substance abuse by a parental figure increases the risk that

---

[2] His former co-defendant turned out to have been a minor at the time of the offense, which resulted in the government dismissing the charges against him.
[3] When federal agents arrested him one month later, Mr. Dixson similarly possessed additional drugs that he was holding for another dealer.

a person will develop his/her own substance use disorder ("SUD"). *See* Rachel N. Lipari & Struther L. Van Horn, *The CBHSQ Report: Children Living With Parents Who Have a Substance Use Disorder*, SUBSTANCE ABUSE & MENTAL HEALTH SERVICES ADM. (August 24, 2017) ("These children [of parents with an SUD] are also more likely to have higher rates of mental and behavioral disorders. Children who are exposed to a parent with SUDs are more likely to develop SUD symptoms themselves.") (citing Joseph Biederman et al., *Patterns of Alcohol and Drug Use in Adolescents can be Predicted by Parental Substance Use Disorders*, 106 PEDIATRICS 4 (2000))[4]. Studies have found that exposure to a parental SUD specifically during adolescence correlated with "significantly greater risk for developing an SUD" as compared to exposure during pre-pubescence. Amy Yule & Timothy Wilens, *Familial Influences on Adolescent Substance Use*, 28 PSYCH. TIMES 10 (2011). Much of Mr. Dixson's exposure to his stepfather's alcohol abuse occurred during his adolescence, as his stepfather only entered his life when he was around 10 years old. PSR ¶ 95. Such exposure at this period of Mr. Dixson's life, then, automatically placed him at significantly greater risk of developing his own SUD—a risk that, as it turns out, sadly came to fruition.

Mr. Dixson's mother raised him and his two brothers essentially on her own until Mr. Dixson was 10 years old. PSR ¶ 94. His biological father was largely absent from his life after leaving the family when Mr. Dixson was three. *Id.* What Mr. Dixson does remember about his biological father is not positive, to say the least. He remembers that his mother had to change the spelling of their last name because of his father's bad credit. *Id.* He also remembers—vividly—witnessing his father put his mother's head through a window shortly before his father left for good. *Id.* ¶ 96.

Despite maintaining close relationships with his brothers while they were growing up, Mr. Dixson lost touch with them when he began using illicit substances in his early adulthood. *Id.* ¶¶ 96, 101. This estrangement meant that he was alienated from the very support system that could have helped him to turn things around and combat what was turning into an overwhelming addiction. When it comes to his family, Mr. Dixson is ashamed of what his life has become due to his drug use, and he dreams of reconnecting with his brothers once he is sober. *Id.* ¶ 98. Mr. Dixson's downward

---

[4] Available at https://www.samhsa.gov/data/sites/default/files/report_3223/ShortReport-3223.html

spiral into the depths of his addiction coincided with a significant rise in arrests and subsequent criminal convictions. The nature of most of these law enforcement contacts, including the instant offense, indicates a direct causal link to poverty and/or substance abuse as the underlying causes. *See* PSR ¶ 126 ("In sentencing the defendant, the Court may wish to consider that the instant offense, as well as much of the defendant's criminal history, appears to have been driven to [sic] a long-standing addiction to crack cocaine.").

### C.     The need to provide Mr. Dixson with substance abuse treatment in the most effective manner

All parties involved, including Mr. Dixson, agree that treatment of Mr. Dixson's underlying substance use disorder is desperately needed, and would go a long way towards helping him to lead a law-abiding life once more. Certainly, recovery and lasting sobriety will not be easy to achieve, given the extent of Mr. Dixson's addiction; nonetheless, Mr. Dixson is committed to pursue those goals with the assistance and support of programming that he has never had the opportunity to access in the past. If the past three-plus decades tells the Court anything, it is that a cycle of arrests and subsequent incarceration is not the correct solution for Mr. Dixson. Rather, an alternative approach of supervision with supportive services is warranted[5]—one that seeks to address what drove Mr. Dixson into the criminal justice system in the first place. The longer he stays in custody for this matter, the longer he goes without badly needed drug treatment.[6] He has already lost over 30 years of his life to a devastating drug habit that led him first to the streets, and then in and out of various jail cells. By imposing a sentence that would allow Mr. Dixson to immediately begin a term of supervised release, which would come with the substantial programming resources of the United States Probation Office, this Court can and should help to ensure that he does not lose any more time to substance abuse and its far-reaching consequences.

---

[5] Given Mr. Dixson's lack of housing, he understands that a residential program would likely be the most effective way for him to receive substance abuse treatment, at least until he can find a stable residence.

[6] Mr. Dixson has not participated in drug treatment while at Santa Rita Jail during the pendency of this case. This is not because he is not interested in treatment, but rather because he does not feel comfortable or safe sharing such personal information in an incarceratory setting.

DEF'S SENT. MEM.
*DIXSON*, CR 19–527 WHO

**CONCLUSION**

For all the reasons set forth above, Mr. Dixson respectfully requests that the Court impose a sentence of time served—the equivalent of four months in custody—with three years of supervised release, a $100 special assessment, and no fine. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).

Dated:   February 13, 2020          Respectfully submitted,

                                    STEVEN G. KALAR
                                    Federal Public Defender
                                    Northern District of California

                                    _____/S_____
                                    ANGELA CHUANG
                                    Assistant Federal Public Defender